1   LTL ATTORNEYS LLP
2   Joe Tuffaha (State Bar No.  253723)
   joe.tuffaha@ltlattorneys.com
3   Prashanth Chennakesavan (State Bar No.  284022)
4      prashanth.chennakesavan@ltlattorneys.com
   300 S. Grand Avenue, 14th Floor
5   Los Angeles, California 90071
6   Telephone:  213-612-8900
   Facsimile:  213-612-3773
7
8   Attorneys for Defendants
   Robert Goldstein and DRG Strategic, LLC
9   d/b/a Meridian Global

10          **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

12

| 13  MATTHEW PLISKIN, AS TRUSTEE OF THE ICPW NEVADA TRUST | Case No:  2:18-cv-09491 FMO (ASx) |
|---|---|
| 14 | |
| 15 | **DECLARATION OF ROBERT GOLDSTEIN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| 16          Plaintiff, | |
| 17     v. | [Notice of Motion and Motion to Dismiss and [Proposed] Order filed concurrently herewith] |
| 18  ROBERT GOLDSTEIN and DRG STRATEGIC, LLC d/b/a MERIDIAN GLOBAL, | |
| 19 | Hearing: |
| 20 | Date: February 14, 2019 |
| 21          Defendants. | Time: 10:00 a.m. |
| 22 | Crtrm: 6D |
| 23 | |
| 24 | Judge: Hon. Fernando M. Olguin |

25
26
27
28

## DECLARATION OF ROBERT GOLDSTEIN

I, Robert Goldstein, declare as follows:

1. My name is Robert Goldstein, I am over twenty-one (21) years of age, and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I am the Managing member of DRG Strategic, LLC ("DRG Strategic"). DRG does business as Meridian Global ("Meridian"). DRG Strategic and Meridian will be collectively referred to herein as "DRG." It is through my position with DRG, my duties and responsibilities with and for DRG, the business records of DRG and my continued involvement with the DRG that I have knowledge of the facts set forth herein.

3. I have worked in the clothing and textile industries as a garment importer and trader for over 20 years. DRG's primary business is contracting with purchasers of clothing and textile goods and with factories who manufacture such clothing and textile goods, including private label goods, to be supplied to various wholesale and retail customers. I have worked with factories in China, Bangladesh, Vietnam, India and other countries.

4. In the course of my business, I negotiated on several occasions with Jeffrey Cordes ("Cordes") and William Aisenberg ("Aisenberg"), among others, while they were employed with Wall Industries and while they were employed with Ironclad Performance Wear ("Ironclad") for the purchase by their respective employers of various clothing and textile goods. All these business dealing occurred in the Dallas-Fort Worth area ("DFW").

5. In 2015, Cordes and Aisenberg contacted me in the DFW area in connection certain gloves Ironclad owned that were in Canada. Cordes

1

and Aisenberg mentioned something about litigation in Canada and restrictions that prohibited Ironclad from selling the gloves with the current labels and also prohibited and restricted Ironclad itself from relabeling the gloves. I was asked by Cordes and Aisenberg to purchase the glove and have them shipped to China, Bangladesh or some other offshore entity for relabeling, and then to sell the relabeled gloves into offshore markets. Ironclad said they were restricting DRG's sales efforts to offshore markets so as not to interfere with their markets and marketing in the United States. I told them relabeling and selling goods in the Asian markets was not something DRG had done, but it would try. We negotiated an agreement with respect to the gloves. All of these conversations and negotiations occurred in DFW. Under the terms of the agreement, DRG was to pay a certain price for the gloves, DRG was responsible for and would pay for the relabeling of the gloves and attempt to sell the relabeled gloves to offshore markets. If DRG was successful in selling any or all of the gloves to offshore markets, it kept any amount over the price it paid Ironclad for the gloves and the cost of relabeling same. If DRG was unable to sell any or all of the relabeled gloves into offshore markets, Ironclad would purchase the relabeled gloves from DRG at an agreed upon price.

6.     I contacted several of the overseas factories and persons with whom DRG had done business in the past about relabeling and purchasing the relabeled gloves. None expressed a real interest and expressed various concerns as they were in the business of manufacturing, selling and exporting goods rather than importing, relabeling and purchasing goods. Other issues arose concerning DRG relabeling and selling the gloves in the offshore markets.

2

7.   I informed one or more of Ironclad's employees of the problems I was experiencing in getting the gloves relabeled overseas and they suggested I contact a third-party relabeling company. Ironclad gave me the name of a contact person and I contacted this person about relabeling of the gloves. I learned the relabeling company was AMS. I was never told AMS was in anyway related to Ironclad or that the relabeling would occur in an Ironclad facility and it was my understanding that AMS was a separate company with its own relabeling facilities. AMS agreed to accept the gloves, relabel them and then ship them to a location or locations that would be provided to AMS after relabeling was completed.

8.   DRG performed its part of the agreement with all such performance occurring in the DFW area. After arranging to have and having the gloves shipped to AMS and relabeled, DRG tried but was unsuccessful in selling the gloves to offshore markets. DRG paid AMS for relabeling of the gloves. Pursuant to the parties' agreement Ironclad purchased the relabeled gloves from DRG. Ironclad contacted DRG on two other occasions in connection with this same agreement. Each time the gloves were relabeled and DRG was unable to sell any of the gloves into offshore markets and sold them to Ironclad.

9.   All of the gloves were relabeled as requested and AMS was fully paid by DRG for the relabeling. Neither Ironclad nor AMS ever raised any issues or asserted any claims with respect to the relabeling of the gloves. Upon information and belief, after DRG sold the relabeled gloves to Ironclad, Ironclad was successful in selling the relabeled gloves.

10.  All conversations and negotiation DRG had with any Ironclad employees occurred in DFW. All agreements DRG entered into with Ironclad were entered into in DFW. DRG sent all invoices to Ironclad in DFW and

DECLARATION OF ROBERT GOLDSTEIN
CASE NO. 2:18-CV-09491-CBM (ASx)

payment of same were made by Ironclad in DFW.  DRG's conversations and negotiations with AMS occurred by telephone while I was in DFW. DRG received all invoices from AMS in DFW and all payments to AMS were made by DRG in DFW.  At no time did I or anyone else from DRG go to California in connection with the gloves in question.  I have never been to AMS's warehouse in California.  DRG does not do any business in California on a regular, constant or consistent basis.

11. I was never unaware of any accounting issues or other financial dealings of Ironclad or of any employees of Ironclad, including Aisenberg and Cordes.  At no time did anyone from Ironclad tell me they were entering into the transactions concerning the gloves in order to change, alter or otherwise affect any promises that were made, sales forecasts, inventory values, revenues or growth numbers. At no time did anyone from Ironclad tell me about any representations that management of Ironclad made to the Ironclad's Board of Directors, including about Ironclad's projected sales, revenue growth, inventory values, or any other financial information about Ironclad.

12. Neither I nor DRG has ever maintained a residence or office in California and do not regularly conduct business in California. DRG has never had any employees in California.   It would be a burden on me and DRG to defend this lawsuit in California.  DRG is a small family owned business with no employees and minimal resources to spend on lawsuits.   It is my understanding and belief that the former Ironclad employees with whom I dealt, including Aisenberg and Cordes, now reside in Texas, Florida and Michigan.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

4

1

2    Executed on this 16th day of January, 2019 in Dallas, Texas.

3    _____

4

5                    ROBERT GOLDSTEIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    5